|  |  |  |
|---|---|---|
| DOMINIQUE MORRISON, SARA HAWES, CASSANDRA CHIARALUCE, and JONATHAN FONTAINE individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Case No.: 1:19-cv-983 |
| v. | ) ) |  |
| AQ TEXTILES LLC and CREATIVE TEXTILE MILLS PVT. LTD., | ) ) ) |  |
| Defendants. | ) ) ) |  |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Dominique Morrison, Sara Hawes, Cassandra Chiaraluce, and Jonathan Fontaine ("Plaintiffs") bring this action on their own behalf and on behalf of putative classes (the "Classes") consisting of Plaintiffs and all others similarly situated, against AQ Textiles LLC ("AQ Textiles" or "AQ"), and Creative Textile Mills Pvt. Ltd. ("Creative Textiles") (together "Defendants"). All allegations herein are based on information and belief, except for those paragraphs pertaining to Plaintiffs' own actions, which are alleged based on personal knowledge.

## <u>INTRODUCTION</u>

1.     Plaintiffs bring this action on their own behalf and on behalf of Classes consisting of Plaintiffs and all others similarly situated to redress Defendants' deceptive acts and unconscionable business practices designed to deceive and mislead consumers

into believing that Defendants' bedding sheets had higher thread counts than they truly possess and as such were of better quality, softer and more comfortable for sleeping than products with lesser thread counts.

2.    Plaintiffs and the Classes received less than what was promised by Defendants due to the improperly inflated thread counts represented on bedding sheet labels sold and marketed by Defendants throughout the United States and the State of North Carolina.

3.    Members of the bedding sheet products industry including the Defendants and retailers consistently communicate to consumers that higher thread count sheets are of better quality, softer, and more comfortable for sleeping. Federal Trade Letter attached hereto address this.

4.    As a result, consumers purchasing bedding sheets use thread count as a primary indicator of the quality of the sheets offered for sale and pay higher prices for higher thread count bedsheets. *See* https://www.mattressadvisor.com/thread-count-really-matter-sheets/ (last visited March 24, 2021) ("Since the mid-1990s, bed linens manufacturers have marketed high-thread count sheets as the top of the line in bedding. Higher thread counts mean higher prices, which consumers happily pay believing they are buying top quality sheets with thread counts of 750, 800, 1000, or even higher.").

5.    As part of a scheme to make their bedding sheets more attractive to customers, boost sales, and increase profits, Defendants departed from well-established and long-standing industry standards governing the measurement and advertisement of

thread counts and inflated the thread counts on the labels of the products it marketed and distributed in North Carolina and nationwide.

6.     The American Society for Testing and Materials' ("ASTM") Standard Test Method for Warp (End) Count and Filling (Pick) Count of Woven Fabric, Designation: D3775-12 is the standard used to determine thread counts.

7.     On January 25, 2018 and February 16, 2018, the Texas Department of Agriculture ("TDA") sent letters to AQ Textiles explaining that it, based on thread count complaints it received concerning sheets distributed by AQ, had three sheet sets tested by Vartest (a New York, NY quality assurance and compliance textile testing lab) in November and December of 2017.  Using industry standard ASTM D3775, Vartest determined, for the TDA, that AQ Textile's (1) Fairfield Square Essex Stay Fit 1200 thread count sheets had an actual thread count of 363; (2) Fairfield Square Luxury Sateen Essex Stay Fit 1200 thread count sheets had an actual thread count of 441; and (3) Ultra Lux Wrinkle Resistant Luxury Weave 800 thread count sheets had an actual thread count of 293.  Exhibit A (letters from Texas Department of Agriculture to AQ Textiles dated January 25 and February 16, 2018 ("TDA Letters").

8.     Based on the Vartest lab test results showing massive inconsistency between the represented and actual thread counts, the TDA requested that the Office of the Attorney General, State of Texas, Consumer Protection Division, and the United States Federal Trade Commission "investigate the matters" as AQ (along with the retailer and manufacturer) "may have engaged in deceptive acts and practices within the State of Texas which are prohibited under Section 17-46 of the Texas Business and Commerce

Code."  TDA Letter, Jan. 25, 2018 at p. 1.

9.    The TDA also urged AQ Textiles (along with the retailer and manufacture) to "stop sales of the said Goods, or to correctly repackage said Goods to reflect the proper characteristics of said Goods."  TDA Letter, Jan. 25, 2018 at p. 2.

10.    Independent test results for the sheets purchased by Named Plaintiffs here, included below, similarly show that the thread count for their sheets, like the sheets tested for the TDA, are much lower than reflected on their labels.

11.    Named Plaintiff Fontaine purchased the same sheets (1200 thread count Fairfield Square Essex Stay Fit) determined by the TDA via Vartest to have an inflated thread count.

12.    Plaintiff Hawes' Somerset Collection brand sheet set, which was represented to have a 900 thread count on the label, had a true thread count, when tested according to ASTM D3775, of approximately 227.

13.    Plaintiff Morrison's Grande Estate 800TC Luxurious Sateen Weave sheets, which were represented to have an 800 thread count, had a true thread count, when tested according to ASTM D3775, of approximately 224.

14.    Defendants misrepresented, and continue to misrepresent, the thread count and the corresponding actual quality, durability, longevity, fitness, softness, comfort and other characteristics associated with bedding sheets they advertise and sell.

15.    The representation of the false and misleading thread count also deceives and misleads consumers into believing that they are purchasing a product which is of higher quality, softness and better for sleeping than products with a lower thread count.

16.     Defendants knowingly departed from following well accepted and known industry standards for calculating thread counts, and thereby inflated thread counts to market, advertise, package, and sell their bedding sheets through their agents and retail partners throughout the United States and North Carolina.  For instance, Macy's website prominently features AQ Textiles' products, listing AQ Textiles first in the bed sheets by brand category.  *See* https://www.macys.com/shop/bed-bath/bed-sheets/Brand/AQ%20Textiles?id=9915 (last visited March 23, 2021) (showing line of Macy's sheets "from AQ Textiles.").

17.     Inaccurate thread counts create reasonable but mistaken beliefs by consumers about the quality of bedding sheets.

18.     For example, reasonable consumers believe that a bedding sheet package label stating that it contains 800 thread-count bedding actually contains bedding with a thread count measured at 800 according to an honest and consistent industry standard.

19.     Likewise, consumers believe that an 800 thread-count bedding is going to be of higher quality, softer and better for sleep and more comfortable than a lower thread-count bedding.[1]

20.     Consumers rely on Defendants' representations and advertising as they compare and assess sheet products and make purchase decisions.

21.     As a direct result of Defendants' improper, deceptive, and unconscionable scheme to misrepresent sheet thread counts, Plaintiffs and other Class members suffered

---

[1] *See* https://www.macys.com/ce/splash/how-to-choose-bed-sheets/index (last accessed March 24, 2021) ("the higher the thread count, the denser & smoother the sheet will feel.")

damages because the inflated thread counts induced Plaintiffs and other members of the Class to purchase Defendants' products when Plaintiffs and other members of the Class would not have purchased them, or would have paid a lower price for the products if they had known the actual thread counts at the time of purchase.

## JURISDICTION AND VENUE

22.     The foregoing allegations are incorporated by reference and realleged herein.

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and defendant are citizens of different states.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

25.     Defendant AQ Textiles is a North Carolina LLC with it principal place of business and registered offices located in Greensboro, North Carolina 27410.

26.     Defendants' improper conduct set forth herein occurred in this District or was conceived of and executed from this District in whole or in part.

27.     Defendants' decisions to engage in the improper conduct set forth herein were made in this District.

28.     Further, Defendants' bedding sheets at issue were advertised, marketed, sold and/or distributed in this District.

29.     Creative Textiles has admitted that it and AQ Textiles share "a contractual relationship."[2]

30.     According to Creative's Supply Chain Summary from November 9, 2017 to November 9, 2018, Creative's "Top Importer" was AQ.[3]

31.     According to AQ's Supply Chain Summary from November 9, 2017 to November 9, 2018, AQ's "Top Supplier" was Creative.[4]

32.     An AQ bill of lading report dated December 6, 2018, as recorded by U.S. Customs, shows that AQ imported from Creative 2893 cartons of cotton woven bed sheets.[5]   The listed "Consignee" for the shipment is "Aq Textiles Llc."[6]

33.     The harm alleged herein occurred in this District or emanated from Defendants' improper conduct that occurred in this District, in whole or in part.

## PARTIES

34.     The foregoing allegations are incorporated by reference and realleged herein.

---

[2] *Adam v. TJX*, 17-cv-11260 (D. Mass.) ECF No. 82 at ¶ 9 (Declaration of Agarwal ("Agarwal Decl.").

[3] Descartes Datamyne Trade Report, http://www.datamyne.com/supplier/6192388/creative-textile-mills-pvt-ltd (last visited March 23, 2021).

[4] Descartes Datamyne Trade Report, http://www.datamyne.com/importer/6774638/aq-textiles-llc (last visited March 23, 2021).

[5] Panjiva Shipping Information, https://panjiva.com/Aq-Textiles-LLC/32406626 (last visited March 23, 2021).

[6] *Id*.

35.     Plaintiff Dominique Morrison is an adult citizen of St. Louis County, Missouri.

36.     Plaintiff Morrison purchased dark gray Grande Estate 800TC Luxurious Sateen Weave sheets during the Class Period from the Ross store located at 3614 S. Lindbergh Blvd. in St. Louis, Missouri.  Although she does not recall the specific date of purchase, she believes that she purchased them sometime in the fall of 2016/ early winter of 2017, prior to February 2017.

37.     Although she does not recall the exact price she paid for the sheets, she believes that she paid around $40.00 but that the price tag also referenced a higher amount that Defendant represented that the sheets were worth given their represented quality.

38.     The Grande Estate 800TC Luxurious Sateen Weave sheets were imported and labeled by AQ Textiles and manufactured and packaged by Creative Textiles, which were then marketed and sold to Plaintiff and other consumers.

39.     Plaintiff Morrison reasonably believed and relied on the representations on the label and price tag of Defendant's sheets that the sheets she purchased were in fact of 800 thread count.

40.     Plaintiff Morrison relied on the representations regarding the higher-value high thread count on the packaging when purchasing these sheets and believed that she was purchasing sheets with an 800 thread count and that the sheets were of higher quality, more durable, last longer, softer and better for sleep than sheets with lower thread counts.

41.     Plaintiff was deceived by the representations made on the label and price tag, however, because the Grande Estate 800 TC sheets thread counts are far less than the represented 800.

42.     Had Plaintiff Morrison known that the sheets were not truly 800 thread count sheets, she would not have purchased them or would have paid a lower price for the products if they had known the actual thread counts at the time of purchase.

43.     The price tag on the Grande Estate sheet sets further represents that, although the consumer will only have to pay $39.99 for the sheet sets, the "comparable value" of the sheets was $100.00.  This representation regarding the "comparable value" misleads consumers into believing that they are purchasing the higher quality and higher priced high thread count sheets which have a value of $100.00 but were supposedly discounted for the consumer's benefit.

44.     Defendant knew or should have known that the advertised thread counts on the labels of the sheets manufactured and imported by Creative Textiles and AQ Textiles were inaccurate and over inflated.  Nonetheless, AQ Textiles represented and sold them to consumers as if they were of the higher quality represented on the labels.

45.     Defendant's representations regarding the higher quality and thread counts of these bedding and linen products were deceptive and misleading according to both the applicable industry standard and the FTC's guidelines for accurately describing thread counts.

46.     Defendants further knew or should have known that the advertised "comparable value" on the price tags of the sheets manufactured and imported by

Creative Textiles and AQ Textiles were inaccurate since they were not actually high-priced, high quality, high thread count sheets. Nonetheless, they were sold to consumers as if they were of the high quality represented on the labels.

47. The representations regarding the thread count and comparable value of these bedding and linen products were deceptive and misleading because the bedding and linen were not actually high-priced, high quality, high thread count sheets satisfying the applicable industry standard and the FTC's guidelines for accurately describing thread counts.

48. Plaintiff Sara Hawes is an adult citizen of California.

49. In or around May 2017, Ms. Hawes purchased a Somerset Collection brand queen-size sheet set, manufactured by Defendant Creative Textiles for and labeled and distributed by Defendant AQ Textiles and represented to be "900 Thread Count," from a Macy's retail store located at 8500 Beverly Blvd. in Los Angeles, California.

50. Ms. Hawes relied on the thread count representations on the packaging when purchasing these sheets and believed that she was purchasing sheets with a 900 thread count and that the sheets were of higher quality, softer, better for sleep, and more comfortable than sheets with lower thread counts.

51. A photo of Ms. Hawes' sheet label (and insert card) is attached hereto as Exhibit E.

52. Ms. Hawes paid $76.11 ($69.99 plus tax) for this sheet set.

53. Plaintiff Cassandra Chiaraluce is an adult citizen of Massachusetts.

54.     In or around October 2017, Ms. Chiaraluce purchased a Bradford Stay Fit brand queen-size sheet set, manufactured by Defendant Creative Textiles, for and labeled and distributed by Defendant AQ Textiles and represented to be "800 Thread Count" from a Macy's retail store located at 85 Rockingham Park Blvd. in Salem, New Hampshire.

55.     Ms. Chiaraluce relied on the thread count representations on the packaging when purchasing these sheets and believed that she was purchasing sheets with an 800 thread count and that the sheets were of higher quality, softer, better for sleep, and more comfortable than sheets with lower thread counts.

56.     Ms. Chiaraluce paid $69.99 for the sheet set.

57.     Plaintiff Jonathan Fontaine is an adult citizen of Massachusetts.

58.     In or around October 2017, Mr. Fontaine purchased a Fairfield Square Essex Stay Fit brand queen-size sheet set, manufactured by Defendant Creative Textiles for and labeled and distributed by Defendant AQ Textiles and represented to be "1200 Thread Count," from a Macy's retail store located at 75 Middlesex Turnpike in Burlington, MA. This is the same style of sheets tested by Vartest for the TDA in 2017 and found to contain a lesser thread count than stated.

59.     Mr. Fontaine relied on the thread count representations on the packaging when purchasing these sheets and believed that he was purchasing sheets with a 1200 thread count and that the sheets were of higher quality, softer, better for sleep, and more comfortable than sheets with lower thread counts.

60.     Mr. Fontaine paid $84.99 ($79.99 plus tax) for this sheet set.

61.     Defendant AQ Textiles is a North Carolina LLC with it principal place of business and registered offices located at 214 Staunton Drive, Greensboro, North Carolina 27410.

62.     Defendant AQ Textiles, on behalf of Creative Textiles, imports and distributes the relevant sheet and bedding products.

63.     Defendant Creative Textiles is a private limited company organized under the laws of the Republic of India, with its primary place of business at 212, Cama Industrial Estate, Sun Mill Compound Mumbai, Maharashtra 400013 India.

64.     Defendant Creative Textiles manufactures and sells textiles, including the relevant sheets and bedding products, throughout the United States through its contractual partner, AQ.

65.     According to Creative's Supply Chain Summary from November 9, 2017 to November 9, 2018, Creative's "Top Importer" was AQ.   According to AQ's Supply Chain Summary from November 9, 2017 to November 9, 2018, AQ's "Top Supplier" was Creative.  An AQ bill of lading report dated December 6, 2018, as recorded by U.S. Customs, shows that AQ imported from Creative 2893 cartons of cotton woven bed sheets.

66.     The listed "Consignee" for the shipment is "Aq Textiles Llc."  *See* Descartes Datamyne Trade Report, http://www.datamyne.com/supplier/6192388/creative-textile-mills-pvt-ltd (last visited March 23, 2021); *see also* Descartes Datamyne Trade Report, http://www.datamyne.com/importer/6774638/aq-textiles-llc (last visited March 23,

2021); Panjiva Shipping Information, https://panjiva.com/Aq-Textiles-LLC/32406626
(last visited March 23, 2021).

## FACTUAL ALLEGATIONS

67.     The foregoing allegations are incorporated by reference and realleged
herein.

68.     For consumers purchasing bedding sheets, thread count is used as an
indicator of fabric quality and a basis on which they make purchasing decisions.

69.     As the thread count increases, so does the price that consumers are willing
to pay for sheets given the connection between higher thread count and higher quality for
consumers.

70.     The sheets at issue were manufactured by Creative Textiles and imported,
labeled, and sold by AQ Textiles to retail partners such as Macys, Ross, Walmart, Kmart,
Bed Bath & Beyond, Target, TJ Maxx, and other retailers and merchants under multiple
brand names.

71.     Other affected bedding sheets sold at retailers across the United States,
include among others, the following products:

- Bradford Stay Fit Queen 800 Thread Count - Macy's;

- Fairfield Square Essex Stay Fit Queen 1200 Thread Count - Macy's;

- Fairfield Square BainBridge Collection Queen 1400 Thread Count - Macy's;

- Sterling Manor Luxury Sateen Weave 700 Thread Count - TJ Maxx;

- Ultra Lux Luxury Sateen Weave 800 Thread Count - TJ Maxx;

- Designer Workshop 600 Thread Count - Kmart;

13

- Luxury Sateen 1000 Thread Count - Kmart;

- Dayton Collection Sateen Queen 400 Thread Count - TJ Maxx;

- Luxury Sateen 530 Thread Count, Ashford Collection - Macys;

- Hotel Collection 800 Thread Count - Macy's;

- Charter Club Allure 2 Pillowcase 600 Thread Count - Macy's;

- Fieldcrest 700 Thread Count Supima Classic Hemstitch Queen - Target;

- UltraLux Wrinkle Resistant Luxury Sateen Weave Queen 1200 Thread Count - TJ Maxx;

- SOHOME Studio Queen 400 Thread Count - TJ Maxx; and

- Park Avenue Queen 350 Thread Count - TJ Maxx.

72.     The affected sheets, including the products purchased by Plaintiffs, are also offered regularly for sale and are sold via the internet through retailers' websites such as Better Home and Gardens, Ebay, ShopSyle, and PeopleShop.

73.     Macy's website prominently features AQ Textiles' products, listing AQ Textiles first in the bed sheets by brand category. *See* https://www.macys.com/shop/bed-bath/bed-sheets/Brand/AQ%20Textiles?id=9915 (last visited March 23, 2021) (showing line of Macy's sheets "from AQ Textiles").

74.     There are dozens of AQ Textiles sheet sets listed for sale on Amazon.[7]

75.     Industry participants at each level of the supply chain, including Defendants, know that consumers will pay higher prices for sheets and bedding products

---

[7] *See* https://www.amazon.com/Bedding-Bath-AQ-Textiles-Home-Kitchen/s?rh=n%3A1057792%2Cp_4%3AAQ+Textiles (last accessed March 24, 2021).

with a higher thread count and as such increase the price as the thread counts on the products increase.

76.    This includes manufacturers such as Defendant Creative Textiles, and distributors/importers such as Defendant AQ Textiles.

77.    Consumers rely on represented thread count as the gauge for the quality of their bedding sheet. *See* https://abcnews.go.com/GMA/story?id=125380&page=1, available at http://abcnews.go.com/GMA/ story?id=125380&page=1 (last visited March 23, 2021) ("Consumers who enjoy slipping under top-quality bed sheets rely on thread count as a gauge while shopping….").

78.    Consumers pay more for sheets represented to possess a higher thread count. *Id.* ("A single-ply 300-count can run about $55 a set, while the 600 thread-count sheets that [tested as] only a 300-count is $180 a set.").

79.    An informal survey of the prices of cotton king-size bedding sets at online retailers in December 2016 showed that as thread count increased, so did the price for the bedding.



80. Consumers are misled to believe that the higher the thread count the higher quality of the sheet and consumers are therefore willing to pay more for sheets with higher thread counts. *See* https://www.mattressadvisor.com/thread-count-really-matter-sheets/#:~:text=Higher%20thread%20counts%20mean%20higher,%2C%201000%2C%20or%20even%20 ("Since the mid-1990s, bed linens manufacturers have marketed high-thread count sheets as the top of the line in bedding. Higher thread counts mean higher prices, which consumers happily pay believing they are buying top quality sheets with thread counts of 750, 800, 1000, or even higher."). *See also* https://www.styleathome.com/interiors/bedroom/article/buying-guide-the-truth-about-thread-count ("There's no doubt that most consumers believe the higher the thread count, the better the quality, but this isn't entirely true"); www.thesleepjudge.com/best-sheet-

thread-count/ ("Ranging from colors, designs, sizes, and thread counts, one could ... If you're someone who likes really soft sheets, a thread count ranging from ... keep you either really cool or really warm – depending on the weather. ... This being said, the higher the thread means the higher the price tag would be…."); https://bambi.com.au/understanding-thread-counts/ ("It's is all about inflating the thread count to inflate the price tag," according to ... But what does this really mean and how does it impact the way we sleep? Well …."). [8]

81.     As explained in a Brookliving article dated October 2018, https://www.brooklinen.com/blogs/brookliving/best-thread-count-for-sheets (last accessed March 23, 2021): "Thread count is to sheets what carats are to diamonds—a key but not the only factor when it comes to determining a perfect product. For bed linens, the four major aspects to consider, in order of priority, are cotton, ply, thread count, and weave, but that message gets lost in all of the fancy packaging touting thread count as the be all and end all. Here's the low-down behind one of the industry's most misleading concepts….. according to exposés from New York Magazine and Consumer Reports, many manufacturers use "creative math" to inflate their numbers, advertising thread counts of 800, 1000, and 1200—and leading consumers to believe they are getting a luxury product when they aren't. This allows manufacturers to sell degraded sheets disguised as quality ones, keeping their production costs down while up charging for

---

[8] All of these websites were last visited on March 24, 2021.

something no knowledgeable consumer would want and maximizing profits on the cheap. But here's where that math falters…"

82.     The common or standard practice in the U.S. bedding and linen industry has been to count the number of threads in both the warp (vertical direction) and filling (horizontal direction).  Common or standard practice counts each yarn as one thread, regardless of whether the yarn was a single-ply or multi-ply yarn.

83.     The American Society for Testing and Materials' ("ASTM") Standard Test Method for Warp (End) Count and Filling (Pick) Count of Woven Fabric, Designation: D3775-12, covers the standard test method for measuring warp end count and filling pick count and is applicable to all types of woven fabric.

84.     Section 9.1.1 of D3775-12 instructs on the appropriate method for determining thread count: "Count individual warp ends and filling picks as single units regardless of whether they are comprised of single or plied components."

85.     The terms relevant to ASTM D3775-12, and related to textiles, are defined by ASTM Designation: D123-03.  *See* Section 3, Terminology of ASTM D3775-123. These terms, among others, include:

   a.  **count,** *n − in woven textiles*, the number of warp yarns (ends) and filling yarns (picks) per unit distance as counted while the fabric is held under zero tension, and is free of folds and wrinkles.
   b.  **end,** *n − in fabric*, an individual warp yarn (single or ply) or cord.
   c.  **filling,** *n −* yarn running from selvage to selvage at right angles to the warp in a woven fabric.
   d.  **pick,** *n −* an individual filling yarn.
   e.  **pick count,** *n − in woven fabrics*, the number of filling yarns per unit fabric length.

*See* ASTM D 123-03, Standard Terminology Relating to Textiles.

86.     The prior versions of ASTM D3775, going back at least to 2003, included the same instructions for proper counting under the standard.

87.     ASTM, Standard Test Method for Warp End Count and Filling Pick Count of Woven Fabric, Designation: D3775-03a, Section 9.1.4 instructs, "Count individual warp yarns (ends) and filling yarns (picks) as single units regardless of whether they are comprised of single or plied components."

88.     Per ASTM D3775-12 § 9.1.4, the standard deviation of the samples tested should be 5% or less. In other words, the stated thread count should be within 5% of the actual thread count.

89.     However, some bedding sheet manufacturers and distributors, such as Defendants, are deliberately not adhering to the standard-based, traditional, and common industry practice.  These manufacturers and retailers double or triple the true thread count by counting plied yarns individually.

90.     According to the National Textiles Association ("NTA") and the FTC, this practice of determining thread count by counting plied yarns individually "inflates the thread count numbers to levels which double or triple (or more) the thread count as determined by the long standing, traditional way."

91.     This practice has also created confusion in the marketplace and has caused consumers to compare thread counts that may have been calculated in two dramatically different ways.  *See* FTC Letter to National Textile Association, August 2, 2005, Exhibit B.

92.     In its Letter to the National Textile Association, the FTC stated that:

> [C]onsumers could be deceived or misled by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn. A possible non-deceptive way to disclose both the thread count and the yarn ply would be to state, for example: '300 thread count, 2 ply yarn.' A representation of '600 thread count' for this same product would likely mislead consumers about the quality of the product being purchased.

93. The practice of counting the plies that make up each thread was also condemned by the American Textile Manufacturer's Institute ("ATMI").

94. In a letter sent to the FTC on January 31, 2002, Exhibit C, ATMI addressed marketing of bed sheets and pillowcases to consumers with claims of extremely high yarn or thread count claims, stating that:

> Labeling these products based on a count that includes each ply in plied yarns deceives the customer into believing that bedding products with higher counts are better, when, in fact, they might be inferior because of the method used to determine the count.
>
> …
>
> In many cases, these extremely high counts are achieved by counting yarns within a ply as individual yarns, thus dramatically increasing the number of yarns in a square inch of fabric. A plied yarn is one in which two or more yarns are twisted together to form a single strand.
>
> ATMI believes this method of labeling products based on counting each individual yarn in plies to be a deceptive practice, which misleads the American public into making purchasing decisions to purchase items, based on false and misleading information.
>
> ASTM method D 3775-96 (Standard Test Method for Fabric Count of Woven Fabric) [a prior version of D3775-12] the long-accepted industry standard for determining count. This method has been in use in this country for many years and serves as the industry's standard way to report the count of many woven textile fabrics, including sheeting. It is based on the number of yarns in the warp direction and filling direction, regardless of ply, and has become an important parameter used by consumers to judge the quality of

sheeting products, since the higher the count, the more luxurious the product.

ATMI believes that any information provided to the consumer should be true and correct so as not to be deceptive or misleading. We believe that plied yarns are properly counted as only one yarn. For example, a fabric containing 250 individual four ply yarns in a square inch would be described as a "250 thread count fabric, even though each thread or yarn contained four plies twisted together." It would be false and misleading to describe this as a 1000 thread count product.

95.     The FTC's reply letter to ATMI, dated March 18, 2002, advised how the Commission's staff would analyze claims that counting yarns within a ply as individual yarns to determine thread count was a deceptive practice. *See* Exhibit D.

96.     The FTC advised that where ASTM standards existed, the Commission would give great weight to the applicable standards to determine if product claims were reasonable or deceptive:

A thread count claim, like other objective, material claims about a product, must be supported by a "reasonable basis." In determining what constitutes a reasonable basis for claims, we would consider what experts in the field believe is appropriate, including whether there are relevant consensus based test procedures, such as an ASTM test procedure, or other widely accepted industry practices that apply to the matter. If so, we would give such procedure or practices great weight in determining whether the advertiser has met its substantiation burden. In other related context, the Commission has encouraged the use of ASTM tests. *See* Press Release, FTC Announces Actions on Wool Labeling Rules, dated March 8, 1994 (copy attached) ("In its clarification of the procedure used for testing the fiber content of wool products, the FTC said the industry members should, where possible, use procedures established by the American Society for Testing and Materials (ASTM).").

97.     Despite these long-standing industry standards for calculating thread counts, and the likelihood that deviating from the standards would mislead and deceive

consumers, Defendants manufactured, marketed, advertised, sold and/or distributed bedding sheet products with inflated thread counts.

98.    On January 25, 2018 and February 16, 2018, the Texas Department of Agriculture ("TDA") sent letters to AQ Textiles explaining that it, based on thread count complaints it received concerning sheets distributed by AQ, had three sheet sets tested by Vartest (New York, NY quality assurance and compliance textile testing lab) in November and December of 2017.   Using industry standard ASTM D3775, Vartest determined, for the TDA, that AQ Textile's (1) Fairfield Square Essex Stay Fit 1200 thread count sheets had an actual thread count of 363; (2) Fairfield Square Luxury Sateen Essex Stay Fit 1200 thread count sheets had an actual thread count of 441; and (3) Ultra Lux Wrinkle Resistant Luxury Weave 800 thread count sheets had an actual thread count of 293.   *See* Exhibit A (Letters from Texas Department of Agriculture to AQ Textiles dated January 25 and February 16, 2018 ("TDA Letters")).

99.    Based on the Vartest lab test results, the TDA requested that the Office of the Attorney General, State of Texas, Consumer Protection Division, and the FTC "investigate the matters" as AQ (along with the retailer and manufacture) "may have engaged in deceptive acts and practices within the State of Texas which are prohibited under Section 17-46 of the Texas Business and Commerce Code."  TDA Letter, Jan. 25, 2018 at page 1.

100.   The TDA also urged AQ Textiles (along with the retailer and manufacture) to "stop sales of the said Goods, or to correctly repackage said Goods to reflect the proper characteristics of said Goods."  TDA Letter, Jan. 25. 2018 at p. 2.

101.    On August 30, 2019, the Texas Office of the Attorney General served AQ Textiles with a Civil Investigative Demand requiring it to produce, among other things, specifications, representations, advertisements, and test reports relating to its Luxury Sateen Essex Stay and Ultra Lux 800TC Wrinkle Resistant Luxury Weave sheets. Exhibit F.

102.    The bedding sheet products at issue are inherently defective and not fit for their intended use as high quality luxury sheets and bedding because; as a result of the lower thread count, the sheets are of lower quality, softness, comfort, durability, and longevity than they otherwise would if they in actuality were the represented thread count and quality stated on the labeling and price tags.

103.    Defendants directed their agents and retail partners, such as Macy's, to represent that numerous bedding sheet products were of a certain thread count, but when measured in accordance with industry standards, these thread counts were far less than claimed because Defendants improperly counted.

104.    Defendants represented that numerous bedding sheet products were of a certain thread count, but when measured in accordance with industry standards, these thread counts were far less than claimed because Defendants improperly counted the plies making up the threads in their sheets rather than the threads themselves.

105.    Defendant Creative Textiles, on information and belief, knowingly manufactured and packaged its products with inflated thread counts in order to win business or command higher prices.

106. Defendant AQ Textiles participated in developing the labeling with inflated thread counts, and either knew or should have known that the advertised thread counts were false.

107. Plaintiffs purchased sheets, imported by Defendant AQ Textiles and manufactured by Defendant Creative Textiles, which were represented to be higher thread counts than they were.

108. Defendants made false representations as to the thread count of their sheets and bedding products on the products' packaging, on their retailer's websites, including Macy's.com, as well as in their retailer's stores, including the retail Macy's stores stocked with the relevant goods in the State of California, North Carolina and throughout the United States.

109. Defendants' representations regarding the thread counts of their bedding sheet products were deceptive and misleading according to both the defined industry standard and the FTC's guidelines for accurately describing thread counts.

110. By improperly inflating thread counts contrary to industry standards, Defendants have engaged in, and continue to engage in, practices which are unconscionable, deceptive, and fraudulent, and which are based on false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission in their manufacturing, advertising, marketing, selling, and distribution of bedding sheets.

111.   As a direct and proximate result of Defendants' improper conduct, Plaintiffs and Class Members paid more for bedding sheet products which Defendants represented had inflated thread counts.

112.   By representing that their products had higher thread counts than they actually had, Defendants unjustly profited from the sale of such bedding sheet products to consumers.

113.   The inflated thread counts put forth by Defendants in their products induced Plaintiffs and other Class Members to purchase their products when Plaintiffs and other Class Members would not have purchased them or would only have paid a lower price for the product if they had known the actual thread counts at the time of purchase.

## CLASS ACTION ALLEGATIONS

114.   The foregoing allegations are incorporated by reference and realleged herein.

115.   Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and may seek to certify one or more of the following Classes:

**Nationwide Class:**

All persons in the United States that purchased bedding sheets manufactured, distributed, or labeled by Defendants for personal, family, or household purposes that Defendants represented as having thread counts higher than the bedding or sheet's actual thread counts.

**Missouri Class:**

All persons in the State of Missouri that purchased bedding sheets manufactured, distributed, or labeled by Defendants for personal, family, or

household purposes that Defendants represented as having thread counts higher than the bedding or sheet's actual thread counts.

**North Carolina Class:**

All persons in the State of North Carolina that purchased bedding sheets manufactured, distributed, or labeled by Defendants for personal, family, or household purposes that Defendants represented as having thread counts higher than the bedding or sheet's actual thread counts.

**California Class:**

All persons in the State of California that purchased bedding sheets manufactured, distributed, or labeled by Defendants for personal, family, or household purposes that Defendants represented as having thread counts higher than the bedding or sheet's actual thread counts.

**Massachusetts Class:**

All persons in the Commonwealth of Massachusetts that purchased bedding sheets manufactured, distributed, or labeled by Defendants for personal, family, or household purposes that Defendants represented as having thread counts higher than the bedding or linen's actual thread counts.

**New Hampshire Class:**

All persons in the State of New Hampshire that purchased bedding sheets manufactured, distributed, or labeled by Defendants for personal, family, or household purposes that Defendants represented as having thread counts higher than the bedding or linen's actual thread counts.

116.    The class period commences on the first date that Defendants manufactured, marketed, advertised, sold and/or distributed the offending bedding sheet products and ending on the date that the Court certifies this suit as a class action.

117.    Excluded from the Classes (and in the alternative, the Subclasses defined below) are Defendants, any parent, subsidiary, affiliate, or controlled person of Defendants, as well as the officers, directors, agents, servants, or employees of Defendants.

118. Defendants' policy and practice of inflating thread counts and misrepresenting thread counts by presenting inflated numbers to consumers has affected all Class Members. As such, there are many common questions of law and fact among Plaintiffs and the Class Members, which predominate over questions affecting individual Class members. Common questions include, but are not limited to, the following:

a. Whether ASTM D3775 Standard Test Method for Warp (End) and Filling (Pick) Count of Woven Fabrics was the generally accepted method in the textile industry for calculating thread count during the relevant time period;

b. Whether Defendants knew or should have known that ASTM D3775 was the generally accepted method in the textile industry for calculating thread count during the relevant time period;

c. Whether Defendants misrepresented thread counts on their bedding sheets contrary to industry standards and in contravention of ASTM D3775;

d. Whether Defendants manufactured, advertised, sold, or delivered for sale bedding sheets that were advertised or represented to be of a certain thread count, but were, in fact, of a lesser thread count;

e. Whether Defendants knew or should have known persons would rely on the inflated thread counts in making their purchase decision;

f. Whether Defendants were negligent in representing thread counts on their bedding sheets contrary to industry standards and in contravention of ASTM D3775;

g. Whether Defendants fraudulently concealed that the thread counts and their bedding sheets were inflated, contrary to industry standards and in contravention of ASTM D3775;

h. Whether Defendants' inflated thread counts violated the laws of the States of Missouri, North Carolina, California, Massachusetts, and New Hampshire, and/or other States;

27

i. Whether Defendants are liable for violation of the laws of the States of Missouri, North Carolina, California, Massachusetts, and New Hampshire, and/or other States;

j. Whether Defendants' misrepresentations caused damages to Class Members and the extent of those damages;

k. Whether AQ Textiles responded to the TDA Letters as directed;

l. Whether Defendants were unjustly enriched, and, if so, the extent to which they were unjustly enriched; and

m. Whether Defendants should be enjoined from future conduct of the type complained of herein.

119. Plaintiffs' claims are representative of the putative Classes because their claims are typical of the claims of the Class members and rely on Defendants' misrepresentations and application of an industry standard. If brought and prosecuted individually, the claims of each putative Class member would require proof of the same materials and substantive facts, rely on the same remedial theories, and seek the same relief.

120. Plaintiffs will fairly and adequately protect the interests of the Classes and have retained attorneys experienced in class and complex litigation as counsel.

121. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

122. A class action will permit an orderly and expeditious administration of the claims of the Classes, will foster economies of time, effort, and expense, and will insure uniformity of decisions.

123. The prosecution of individual actions by Class members would: (a) create the risk of inconsistent or varying adjudications with respect to individual Class members; and (b) be grossly impracticable because the cost of vindicating an individual Class member's claim would likely exceed the value of the claim.

124. Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

125. Due to the relatively small amounts of damaged to each member of the Classes, a class action is superior to other available methods for the fair and efficient adjudication of the controversy which is subject of this action.

126. The interests of judicial economy will be served by concentrating litigation concerning these claims in this Court, and there is no known difficulty that would be encountered in the management of these Classes.

127. All conditions precedent for filing this Complaint have been satisfied, occurred or been met including all pre-suit notice to Defendants.

128. Defendants have failed to cure Plaintiffs' concerns.

## EQUITABLE TOLLING

129. The foregoing allegations are incorporated by reference and realleged herein.

130. Despite knowing that their bedding sheets were non-conforming because they did not contain the qualities that Defendants advertised -- specifically with regard to thread counts -- Defendants concealed their non-conforming nature from Plaintiff and the

Class by affirmatively marketing and advertising their products as having certain qualities that they did not have.

131.    Plaintiff and Class Members did not and could not have known that their bedding sheets did not have the qualities that they were advertised to have, as this fact was not disclosed to them and could not have been apparent from a superficial inspection the products.

132.    Plaintiff and Class Members could not have discovered the non-conforming nature of Defendants' products through the exercise of due diligence.

133.    Due to Defendants' fraudulent concealment of the non-conforming associated with their products, Defendants are estopped from asserting statute of limitations defenses to any of the claims alleged herein.

## COUNT ONE
### Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

134.    Plaintiffs incorporate by reference all of the allegations in this Complaint as though fully set forth herein.

135.    This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act (for the purpose of this Count, the "Act") by virtue of 28 U.S.C. § 1332(a)-(d).

136.    Defendants are "suppliers" and "warrantors" within the meaning of 15 U.S.C. § 2301(4) and (5) and/or (7) because they regularly sell sheets and bedding products with a written and/or implied warranty guaranteeing that their products have a certain thread count and a certain corresponding quality.

137. Plaintiffs and other Class Members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased sheets and bedding products for personal, family, or household purposes.

138. The sheets and bedding products are "consumer products" within the meaning of the Act. 15 U.S.C. § 2301(1).

139. The Act provides a cause of action for any consumer who suffers damages because of the failure of a warrantor to comply with a written or implied warranty. 15 U.S.C. § 2310(d)(1).

140. The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value.

141. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this suit.

142. Under the Act, damaged "consumers" have a private cause of action against any warrantor that fails to comply with a written or implied warranty.

143. Under the Act, damaged consumers have a private cause of action against any warrantor that fails to comply with a written or implied warranty.

144. Defendants provided Plaintiffs and the proposed classes with the following express warranty: that the sheets and bedding products had a certain true and accurate thread count.

145. Defendants AQ Textiles and Creative Textiles warranted in their packaging and elsewhere that the sheet and bedding products would meet a certain level of performance over a certain period of time, namely that they had a certain thread count,

31

and would therefore have the performance characteristics of sheets with such thread count.

146.    These express warranties constitute written warranties within the meaning of 15 U.S.C. § 2301(6).

147.    The sheets and bedding products' implied warranties are covered by 15 U.S.C. § 2301(7).

148.    The terms of written warranties and implied warranties became part of the basis of the bargain among Plaintiffs (and all other Class Members) and Defendants when Plaintiffs (and all other Class Members) were deciding to purchase the sheets or bedding products.

149.    Defendants breached these written and implied warranties as described in detail above.

150.    Without limitation, the sheets and bedding products had actual thread counts lower than the ones warranted and advertised.

151.    Privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between AQ Textiles and Creative Textiles, and specifically, of AQ Textiles' and Creative Textiles' warranties.

152.    Upon information and belief these contracts provided for products warranted to be of a particular thread count, and therefore of a quality that would merit a higher price than products labeled with a lower thread count.

153.    Affording Defendants a reasonable opportunity to cure their breaches of warranty would be unnecessary and futile here. At the time of sale of the sheets and

bedding products, Defendants knew, should have known, or were reckless in not knowing of the misrepresentations concerning the products' thread count, but nonetheless failed to rectify the situation.

154. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

155. As a direct and proximate result of Defendants' breach of the written warranties and the implied warranty of merchantability, Plaintiffs and Class Members have suffered damages in an amount to be determined at trial.

156. Plaintiffs, individually and on behalf of a Nationwide Class, seek all damages permitted by law, including a full refund of the purchase price for the sheets, compensation for the monetary difference between the sheets and bedding products as warranted and as sold, incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

157. Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

158. Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

159. Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

160. Defendants have failed to cure Plaintiffs' concerns.

## COUNT TWO
### Breach of Implied Warranty of Merchantability
### (Mo. Rev. Stat. § 400.2-313-314; N.C.G.S.A. § 25-2-314; Cal. Com. Code § 2314; Mass. Gen. Laws Ann. ch. 106, § 2-314; N.H. Rev. Stat. Ann. § 382-A:2-314)

161. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

162. Each Defendant was a "seller," within the meaning of the applicable statutes, and Plaintiffs and North Carolina Class Members were "buyers," within the meaning of the applicable statutes.

163. Each Defendant was a "merchant with respect to goods" within the meaning of the applicable statutes.

164. Pursuant to N.C.G.S.A. § 25-2-314, an implied warranty for Defendants' sheets and bedding products was created by law, guaranteeing that (2) goods to be merchantable must be at least such as: (a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled; and (f) conform to the promises or affirmations of fact made on the container or label if any."

165. Pursuant to Mo. Rev. Stat § 400.2-314(2), an implied warranty for Defendants' sheets and bedding products was created by law, guaranteeing that the goods "(a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the

ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label if any."

166. Pursuant to Cal. Com. Code § 2314(2), an implied warranty for Defendants' sheets and bedding products was created by law, guaranteeing that the goods "(a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label if any."

167. Pursuant to Mass. Gen. Laws Ann. ch. 106, § 2-314(2), an implied warranty for Defendants' sheets and bedding products was created by law, guaranteeing that the goods "(a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as

the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label if any."

168. Pursuant to N.H. Rev. Stat. Ann. § 382-A:2-314(2), an implied warranty for Defendants' sheets and bedding products was created by law, guaranteeing that the goods "(a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label if any."

169. The sheets and bedding products, when sold and thereafter, were not in merchantable condition, were unfit for the ordinary purpose for which they are used, and failed the promises of the warranty of merchantability, because they lacked the quality, properties, and characteristics of sheets with thread counts as high as advertised.

170. Defendants were noticed of these issues within a reasonable time by multiple complaints including the instant one.

171. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Missouri, North Carolina, California, Massachusetts, and New Hampshire Class Members have been damaged in an amount to be proven at trial.

172. Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

173.   Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

174.   Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

175.   Defendants have failed to cure Plaintiffs' concerns.

## COUNT THREE
### Breach of Express Warranty
### Missouri, North Carolina, California, Massachusetts, and New Hampshire
### U.C.C. § 2-313

176.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

177.   Defendants' affirmations of fact and/or promises relating to their sheets and bedding products created express written warranties that the products would conform to Defendants' affirmations of fact and/or promises.

178.   Alternatively, Defendants' descriptions of their sheets and bedding products became part of the bases of the bargains, creating express written warranties that the products purchased by Plaintiffs and Class Members would conform to Defendants' descriptions and specifications.

179.   In fact, the sheets and bedding products purchased by Plaintiffs and the Class Members did not so conform to the descriptions and specifications.

180.   Plaintiffs and the Class Members were the intended targets of Defendants' misrepresentations.

181.   Plaintiffs and the Class Members reasonably relied on Defendants' misrepresentations.

182.    Defendants expressly warrants on the labels of the sheets and bedding products that they have certain thread counts.  In fact, the products' thread counts are lower than promised and warranted.

183.    Plaintiffs and Class Members relied on Defendants' false representations as to the sheets and bedding products' thread counts.

184.    Defendants have breached their express warranties.

185.    As a result of the foregoing, the Plaintiffs and the Class Members have suffered damages in that the value of the products they purchased was less than warranted by Defendants.

186.    Plaintiffs and the Class Members were injured as a result of Defendants' breach of their express warranties about their sheets and bedding products.

187.    By reason of the foregoing, Plaintiffs and the Class Members were damaged in the amount they paid for the falsely labeled sheets and bedding products, together with punitive damages.

188.    Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

189.    Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

190.    Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

191.    Defendants have failed to cure Plaintiffs' concerns.

**COUNT FOUR**
**Negligent Misrepresentation**

192.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

193.    Defendants owed the Plaintiff and Class Members a duty of care to design, develop, test, manufacture, distribute, market, and sell non-defective sheets and bedding products.

194.    Defendants also owed Plaintiff and Class Members a duty of care to warn them of the defects associated with their sheets.

195.    Defendants breached their duty of care by negligently selecting materials for designing, developing, testing, distributing, marketing, and selling the defective sheets.

196.    Defendants also breached their duty of care by negligently failing to warn consumers, contractors, and retailers that the sheets were defective.

197.    Defendants were aware, or reasonably should have been aware, that their sheets were defective.

198.    When they purchased Defendants' products, Plaintiffs and the Class Members were unaware of those products' defective nature.

199.    Plaintiffs and the Class Members justifiably relied on the false representations as to the sheets and bedding products' thread counts.

200.    The defective products resulted in damage to the Plaintiffs and the Class members in that the Plaintiffs and the Class Members would not have purchased those products if they had known they were defective.

201.   As a direct and proximate result of Defendants' negligence, and but for their conduct, the Plaintiffs and the Class Members have sustained, are sustaining, and will sustain damages and losses as alleged herein.

## COUNT FIVE
### Violation of Missouri's Merchandising Practices Act

202.   Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

203.   Missouri's Merchandising Practices Act (the "MMPA") prohibits the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce § 407.020, RSMo.

204.   Defendants' conduct constitutes the act, use or employment of deception, fraud, false pretenses, false promises, misrepresentation, unfair practices and/or the concealment, suppression, or omission of any material facts in connection with the sale or advertisement of any merchandise in trade or commerce because Defendants misrepresent that the Products are of a particular thread count when they are not.

205.   In addition, by claiming the Products are of a particular thread count, Defendants' Products create the false impression and have the tendency and capacity to mislead consumers (*see* 15 CSR 60-9.020) into believing that the Products are of a higher thread count than they actually are.

206. Moreover, the overall format and appearance of the Products have the tendency and capacity to mislead consumers (15 C.S.R. 60-9.030) because they create the false impression that the Products are of a higher thread count.

207. The Products were therefore worth less than the Products as represented, and Plaintiff and Class Members paid extra or a premium for them based on the inflated characteristics.

208. Plaintiff and Class Members purchased the Products for personal, family, or household purposes and thereby suffered an ascertainable loss as a result of Defendants' unlawful conduct as alleged herein, including the difference between the actual value of the Products and the value of the Products if they had been as represented.

209. Plaintiff also seeks injunctive relief to remedy Defendants' ongoing deceptive practices.

210. Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

211. Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

212. Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

213. Defendants have failed to cure Plaintiffs' concerns.

**COUNT SIX**
**Violation of the North Carolina Unfair Trade Practices Act**
**N.C. Gen. Stat. § 75-1.1**

214.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in this Complaint, as though fully set forth herein.

215.    Defendants engaged in "unfair or deceptive acts or practices in or affecting commerce" under the North Carolina Unfair Trade Practices Act when they marketed, sold, or distributed sheets in North Carolina that contained less thread counts than advertised. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures were unfair, deceptive, and fraudulent.

216.    During the Class Period, Defendants' unlawful conduct had a substantial effect on North Carolina commerce.

217.    Defendants' unlawful conduct had the following effects: Plaintiffs relied on misrepresentations. Plaintiffs and Class members overpaid for the sheets. Defendants made sales based on false representations.

218.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property and are threatened with further injury.

219.    Defendants have engaged in unfair and deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1.

220.    Plaintiffs are entitled under N.C. Gen. Stat. § 75-16 to bring a civil action to remedy Defendants' violations and collect treble damages.

221.    Accordingly, Plaintiffs and Class members seek all relief available under N.C. Gen. Stat. §§ 75-1.1 and 75-16, including treble damages and attorneys' fees.

222.    Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

223.    Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

224.    Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

225.    Defendants have failed to cure Plaintiffs' concerns.

## COUNT SEVEN
### Violation of the California Consumer Legal Remedies Act
### Cal. Civ. Code, § 1750, *et seq.*

226.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in this Complaint, as though fully set forth herein.

227.    Plaintiffs bring this count pursuant to the Consumer Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA"), for omissions by Defendants, made actionable by affirmative misrepresentations and/or exclusive knowledge of material facts, and Defendants' active concealment of the truth.

228.    The bedding sheet products are "goods" pursuant to the CLRA at California Civil Code § 1761(a).

229.    Defendants are "persons" pursuant to the CLRA at California Civil Code § 1761(c).

230.    Plaintiffs and the Class Members are "consumers" pursuant to the CLRA at California Civil Code § 1761(d).

231.    Purchases of the bedding sheets products by Plaintiff and the Class Members are "transactions" pursuant to the CLRA at California Civil Code § 1761(e).

### *Affirmative Misrepresentations*

232.    Thread count is a specific, quantifiable attribute of bedding sheets.

233.    There is no requirement to communicate the thread count of bedding sheet products when advertising or selling them to consumers.

234.    However, thread count is a significant driver of consumers' perceptions of the value and quality of the products, as alleged throughout this Complaint.

235.    Defendants sold to Plaintiffs bedding sheet products that were advertised with inflated thread counts and overstated levels quality, durability, longevity, fitness, softness, comfort and other characteristics associated with sheets products of that represented thread count.

236.    Defendants knew or should have known that the thread counts listed by themselves and/or their manufacturers or wholesalers were false or misleading to consumers.

237.    Defendants, as detailed in this Complaint, repeated these false or misleading statements of thread count in various product listings and descriptions, either in the store, or advertisements, or the website, which were seen and relied upon by Plaintiff and Class Members.

238.    These misstatements of the thread count of the bedding products are prohibited by the CLRA, because they are "undertaken by [Defendants] in a transaction

intended to result or which results in the sale or lease of [the bedding products] to any consumer."

239. Defendants violated the CLRA by knowingly advertising that their bedding products had a higher thread count than they actually had and overstating the levels quality, durability, longevity, fitness, softness, comfort and other characteristics associated with sheets products of that represented thread count.

240. Defendants violated the CLRA's proscription against misrepresentation of the "approval, characteristics, ingredients, uses, benefits, or quantities" of the bedding products by advertising a falsely inflated thread count and overstating the levels quality, durability, longevity, fitness, softness, comfort and other characteristics associated with sheets products of that represented thread count.

241. These misrepresentations violated California Civil Code § 1770(a)(5)'s proscription against representing that goods have characteristics that they do not have; Civil Code § 1770(a)(7)'s proscription against representing that goods are of a particular standard, quality or grade when they are of another; and Civil Code § 1770(a)(9)'s proscription against advertising goods with the intent not to sell the goods as advertised.

### *Exclusive Knowledge of Material Facts and Omissions of Material Facts*

242. Upon information and belief, through examination of their own products and interactions with manufacturers or wholesalers, and as otherwise detailed in this Complaint, Defendants have exclusive knowledge concerning the actual thread count of the bedding products and the corresponding levels of quality, durability, longevity,

fitness, softness, comfort and other characteristics associated with sheet products of that represented thread count that they import and sell to consumers.

243. Defendants owe consumers a duty to disclose the true and accurate thread count of the products and the corresponding quality, durability, longevity, fitness, softness, comfort and other characteristics associated with sheet products of that represented thread count and that the thread count information represented by Defendants, and/or the manufacturers or wholesalers of the bedding products and advertised by Defendants is not false and/or misleading.

244. Consumers, including Plaintiff, have no realistic means of determining the actual thread count of the bedding products or the corresponding quality, durability, longevity, fitness, softness, comfort and other characteristics associated with sheet products of that represented thread count.

245. A textile expert with magnifying equipment is needed to make such a determination.

246. Further, the process of testing the thread count damages the sheets. Consumers therefore cannot be expected to discover the true thread count before making a purchase.

247. This is true under any circumstances, but especially when ordering products over the internet or by catalog.

248. Retailers of bedding products frequently fail to identify the manufacturer, importer, or seller of textiles at the point of sale or on product packaging. Import records similarly do not reveal the names of the original manufacturers of the materials used to

construct the imported products. These omissions from packaging and import records make it difficult to trace products back to manufacturers.

249. Defendants concealed from Plaintiffs and Class Members that the thread counts advertised for the bedding products are inflated to more than the actual thread count as a result of counting plies rather than threads, and that these thread counts are not calculated according to the method used by other bedding providers and prescribed by ASTM D3775.

250. Defendants further concealed from Plaintiffs and Class Members the true quality, durability, longevity, fitness, softness, comfort and other characteristics associated with sheets, products of the represented thread count.

251. Plaintiffs and Class Members, as reasonable consumers, attached importance to representations by Defendants concerning the thread counts of the bedding products in deciding whether to purchase the products, and in deciding whether the price was reasonable.

252. Thread counts are a material factor in consumers' determinations of the value, quality, durability, longevity, fitness, softness, comfort and other characteristics of bedding products.

253. Without disclosure of the above information, reasonable consumers such as Plaintiffs were and continue to be deceived by Defendants' false thread counts.

254. Defendants violated the CLRA by failing to disclose material facts and continuing to advertise thread counts Defendants knew to be inflated in, without limitation, product labels, advertisements, product descriptions, and website text.

255. Defendants knew or should have known that their misrepresentations would cause Plaintiffs and Class Members to pay higher prices for the bedding products than they would have paid, had a misleading thread count not been advertised.

256. In failing to disclose material facts contrary to their affirmative representations, Defendants violated California Civil Code § 1770(a)(5)'s proscription against representing that goods have characteristics that they do not have; Civil Code § 1770(a)(7)'s proscription against representing that goods are of a particular standard, quality, or grade when they are of another; and Civil Code § 1770(a)(9)'s proscription against advertising goods with the intent not to sell the goods as advertised.

257. Pursuant to California Civil Code § 1782(d), Plaintiffs seek the following relief for Defendant's violations of CLRA §§ 1770(a)(5), (7), and (9) with regard to the bedding products identified herein:

a.    Actual damages under Civil Code § 1780(a)(1);

b.    Restitution under Civil Code § 1780(a)(3);

c.    Punitive damages under Civil Code § 1780(a)(4);

d.    Attorneys' fees and costs under Civil Code § 1780(d); and

e.    Any other relief the Court deems just and proper under the CLRA.

258. Plaintiffs relied on Defendant' representations.

259. Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

260. Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

Case 1:19-cv-00983-LCB-JLW   Document 36-1   Filed 03/29/21   Page 48 of 99

261.    Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

262.    Defendants have failed to cure Plaintiffs' concerns.

## COUNT EIGHT
### Violation of the California Unfair Competition Law – Unlawful Prong
### Cal. Bus. & Prof. Code, § 17200, *et seq.*

263.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in this Complaint, as though fully set forth herein.

264.    The acts of Defendants described herein constitute unlawful business practices and violations of California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.* (UCL).  Section 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

265.    Defendants' business practices as alleged are unlawful under Federal Trade Commission Act (FTCA) § 5(a), 15 U.S.C. § 45(a), which outlaws "unfair or deceptive acts or practices in or affecting commerce."

266.    Defendants' business practices are unfair under FTCA § 5(a) because they are "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n).

267.    Defendants' business practices are deceptive under FTCA § 5(a) because they include affirmative representations and omissions and are likely to mislead reasonable consumers under the circumstances.

268.    Defendants' business practices are further unlawful under the CLRA and

under UCL § 17000, *et seq.*, as alleged herein.

269. Defendants' business practices are also unlawful pursuant to the FTCA by way of the Textile Fiber Products Identification Act, 15 U.S.C. §§ 70a(a), 70a(b), and/or § 70a(c). These sections make it unlawful, under 15 U.S.C. §§ 41 *et seq.*, to sell, transport, deliver, or advertise "any textile fiber product . . . which is misbranded or deceptively advertised."

270. As a result of Defendants' unlawful business practices, Plaintiffs and Class Members have been harmed and are entitled, pursuant to UCL § 17203, to injunctive relief against the continuation of Defendants' practices, as well as the restitution of payments made for Defendants' bedding products, including other equitable relief, costs, and attorneys' fees as recoverable by law.

271. Plaintiffs relied on Defendants' representations.

272. Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

273. Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

274. Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

275. Defendants have failed to cure Plaintiffs' concerns.

## COUNT NINE
### Violation of the California Unfair Competition Law – Unfair Prong
### Cal. Bus. & Prof. Code, § 17200, *et seq.*

276. Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in this Complaint, as though fully set forth herein.

277. Defendants' acts constitute unfair competition under § 17200. They are contrary to public policy, violative of at least the FTCA, CLRA, and California False Advertising Law, and injurious to the public and to competitors who advertise accurate thread counts.

278. Purchasers of Defendants misleadingly advertised and labeled bedding products, including Plaintiffs and Class Members, were injured because they paid an excessive price for a product other than what they thought they were buying.

279. Falsely advertising thread counts has no conceivable benefit to consumers or to competition.

280. This behavior leads consumers to purchase products they do not want, and it forces competitors to either follow suit in the deceptive conduct or suffer lost sales.

281. Consumers could not have reasonably avoided the injuries they suffered because they lack the skill, knowledge, resources, equipment, and opportunity necessary to discern the true nature of the bedding products Defendants sold.

282. As a result of Defendants' unfair business practices, Plaintiffs and Class Members have been harmed and are entitled, pursuant to UCL § 17203, to injunctive relief against the continuation of Defendants' practices, as well as the restitution of payments made for Defendants' bedding products including other equitable relief, costs, and attorneys' fees as recoverable by law.

283. Plaintiffs relied on Defendants' representations.

284. Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

285. Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

286. Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

287. Defendants have failed to cure Plaintiffs' concerns.

**COUNT TEN**
**Violation of the California Unfair Competition Law – Fraudulent Prong**
**Cal. Bus. & Prof. Code, § 17200,** *et seq.*

288. Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in this Complaint, as though fully set forth herein.

289. Defendants' acts constitute fraudulent business practices under UCL § 17200. They are contrary to public policy, violative of at least the FTCA, CLRA, and California False Advertising Law (UCL § 17500), and injurious to the public and to competitors who advertise accurate thread counts or no thread counts.

290. Defendants represented the bedding products as having a specified thread count with the intention that customers would rely on those representations in their purchases.

291. Defendants knew or should have known that the threat counts they represented were false.

292. Defendants' thread count representations were material factors in the purchases of the bedding products by Plaintiffs and the Class.

293.    Defendants' thread count representations were and continue to be relied upon by reasonable consumers, such as Plaintiffs and the Class.

294.    Due to Defendants' fraudulent and deceptive representations concerning thread count, Plaintiff and the Class paid too much for the bedding products.

295.    As a result of Defendants' fraudulent business practices, Plaintiffs and Class Members have been harmed and are entitled, pursuant to UCL § 17203, to injunctive relief against the continuation of Defendants' practices, as well as the restitution of payments made for Defendants' bedding products including other equitable relief, costs, and attorneys' fees as recoverable by law.

296.    Plaintiffs relied on Defendants' representations.

297.    Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

298.    Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

299.    Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

300.    Defendants have failed to cure Plaintiffs' concerns.

## COUNT ELEVEN
### Violation of the Massachusetts Consumer Protection Law
### Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*

301.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in this Complaint, as though fully set forth herein.

302.     Defendants engaged in "unfair methods of competition and unfair or deceptive acts or practices" under the Massachusetts Consumer Protection Law when they marketed, sold, or distributed sheets in Massachusetts that contained less thread counts than advertised. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures were unfair, deceptive, and fraudulent.

303.     During the Class Period, Defendants' unlawful conduct had a substantial effect on Massachusetts commerce.

304.     Defendants' unlawful conduct had the following effects: Plaintiffs relied on misrepresentations; Plaintiffs and Class members overpaid for the sheets; and Defendants made sales based on false representations.

305.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property and are threatened with further injury.

306.     Defendants have engaged in unfair and deceptive acts or practices in violation of Mass. Gen. Laws Ann. ch. 93A, § 2.

307.     Plaintiffs are entitled under Mass. Gen. Laws Ann. ch. 93A, § 11 to bring a civil action to remedy Defendants' violations and collect treble damages.

308.     Accordingly, Plaintiffs and Class members seek all relief available under Mass. Gen. Laws Ann. ch. 93A, § 11, including treble damages and attorneys' fees.

309.     Plaintiffs relied on Defendants' representations.

310.     Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

311. Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

312. Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

313. Defendants have failed to cure Plaintiffs' concerns.

**COUNT TWELVE**
**Violation of the New Hampshire Consumer Protection Act**
**N.H. Rev. Stat. Ann. § 358-A:1,** *et seq.*

314. Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in this Complaint, as though fully set forth herein.

315. Defendants engaged in "unfair method[s] of competition [and] unfair or deceptive act[s] or practice[s]" under the New Hampshire Consumer Protection Act when they marketed, sold, or distributed sheets in North Carolina that contained less thread counts than advertised. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures were unfair, deceptive, and fraudulent.

316. During the Class Period, Defendants' unlawful conduct had a substantial effect on New Hampshire commerce.

317. Defendants' unlawful conduct had the following effects: Plaintiffs relied on misrepresentations; Plaintiffs and Class members overpaid for the sheets; and Defendants made sales based on false representations.

318. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property and are threatened with further injury.

319. Defendants have engaged in unfair and deceptive acts or practices in violation of N.H. Rev. Stat. Ann. § 358-A:2.

320. Plaintiffs are entitled under N.H. Rev. Stat. Ann. § 358-A:10 and 11 to bring a civil action to remedy Defendants' violations and collect treble damages.

321. Accordingly, Plaintiffs and Class members seek all relief available under N.H. Rev. Stat. Ann. § 358-A:10 and 11, including treble damages and attorneys' fees.

322. Plaintiffs relied on Defendants' representations.

323. Plaintiff Morrison provided Defendants with notice of her and the Classes' claims by letter dated November 27, 2018.

324. Plaintiff Hawes provided Defendants with notice of her and the Classes' claims by letter on or around May 17, 2019.

325. Plaintiffs Chiaraluce and Fontaine provided Defendants with notice of their and the Classes' claims by letter on or around December 5, 2019.

326. Defendants have failed to cure Plaintiffs' concerns.

## COUNT THIRTEEN
**Unjust Enrichment**

327. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

328. Plaintiff brings this Count on behalf of herself and the Class.

329. As Plaintiff and the Class show just grounds for recovering money to pay for benefits Defendants received from them, they have a right to restitution at law through an action derived from the common-law writ of assumpsit by implying a contract at law, or a quasi-contract as an alternative to a claim for breach of contract.

330.    Plaintiff and members of the Class conferred a benefit upon Defendants by purchasing the bedding products with an elevate thread count which was false and misleading.

331.    Defendant had knowledge that this benefit was conferred upon it.

332.    Defendants, having received such benefits, is required to make restitution as the circumstances here are such that, as between the two, it is unjust for Defendants to retain such monies based on the illegal conduct described above.

333.    Such money or property belongs in good conscience to Plaintiff and the Class members and can be traced to funds or property in Defendants' possession.

334.    Plaintiff and Class members have unjustly enriched Defendants through payments and the resulting profits enjoyed by Defendants as a direct result of such payments. Plaintiff's and Class members' detriment and Defendants' enrichment were related to and flowed from the conduct challenged in this Complaint.

335.    Defendants appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff and the proposed Class members, who, without knowledge that the bedding products had elevated thread counts which were false and not accurate and that the bedding products would not perform as advertised, paid a higher price for the product than it was worth.

336.    Defendant also received monies for the bedding products that Plaintiff and the proposed Class members would not have otherwise purchased had they known the truth about the thread counts and quality and characteristics of the bedding products.

337. It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

338. Defendants' retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

339. An entity that has been unjustly enriched at the expense of another is required to make restitution to the other. Under common law principles recognized in claims of common counts, assumpsit, and quasi-contract, as well as principles of unjust enrichment, under the circumstances alleged herein it would be inequitable for Defendants to retain such benefits without paying restitution or damages therefor. Defendant should not be permitted to retain the benefits conferred via payments to be received from and/or paid by Plaintiff and Class members as a result of such transactions, and other remedies and claims may not permit them to obtain such relief, leaving them without an adequate remedy at law.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the putative Class Members pray that the Court enter judgment for them and against Defendants as follows:

a. Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Class, and designating Plaintiffs' counsel as counsel for the Class;

b.    Declaring that Defendants' acts and practices, as described herein, constitute deceptive acts and unconscionable business practices that are unlawful under the Missouri, North Carolina, California, Massachusetts, and New Hampshire consumer statutes, and common law.

c.    Awarding Plaintiffs and the Class permanent injunctive relief prohibiting, restraining, and enjoining defendants from engaging in the conduct complained of herein, including, but not limited to, manufacturing, marketing, advertising, selling, and distributing bedding products that have inflated thread counts;

d.    Directing Defendants to disgorge profits from its misleading and deceptive practices and to pay restitution to the Class;

e.    Awarding Plaintiffs and the Class actual, compensatory damages in an amount to be proven;

f.    Awarding Plaintiffs and the Class restitution of all monies paid to Defendants as a result of unlawful, deceptive, and unfair business practices;

g.    Awarding Plaintiffs and the Class exemplary damages in an amount to be proven;

h.    Ordering Defendants to issue corrective advertising;

i.    Awarding Plaintiffs and the Class reasonable attorneys' fees, experts witness fees, pre- and post-judgment interest, and other costs in amounts to be determined by the Court; and

j.    Granting any other further legal or equitable relief as this Court deems appropriate.

Dated this 29th day of March , 2021.

/s/ Scott C. Harris
Scott C. Harris
N.C. Bar No. 35328
**WHTFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, North Carolina 27603
Phone (919) 600-5000
Facsimile (919) 600-5035
scott@whitfieldbryson.com

Charles LaDuca (*To Be Admitted PHV*)
Brendan Thompson (*To Be Admitted PHV*)
CUNEO GILBERT & LADUCA LLP
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202)789-3960
Facsimile: (202) 789-1813
charles@cuneolaw.com
brendant@cuneolaw.com

Michael McShane
Ling Y. Kuang (*To Be Admitted PHV*)
Kurt D. Kessler (*To Be Admitted PHV*)
AUDET & PARTNERS, LLP
711 Van Ness Avenue
Suite 500
San Francisco, CA 94102
Telephone: (415) 568-2555
Facsimile: (415) 568-2556
mmcshane@audetlaw.com
lkuang@audetlaw.com
kkessler@audetlaw.com

Charles Schaffer (*To Be Admitted PHV*)
LEVIN SEDRAN & BERMAN

510 Walnut Street
Suite 500
Philadelphia, PA 19106
Telephone: (877) 882-1011
Facsimile: (215) 592-4663
cschaffer@lfsblaw.com

Bruce Steckler (*To Be Admitted PHV*)
Stuart Cochran (*To Be Admitted PHV*)
Kirstine Rogers (*To Be Admitted PHV*)
STECKLER GRESHAM COCHRAN
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Phone: 972-387-4040
bruce@stecklerlaw.com
stuart@stecklerlaw.com
krogers@stecklerlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Amended Class Action Complaint was filed electronically with the Court's CM/ECF system, which will send notice of filing to all counsel of record.

This the 29th day of March 2021.

/s/ Scott C. Harris
Scott C. Harris
N.C. Bar No. 35328
**WHTFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, North Carolina 27603
Phone (919) 600-5000
Facsimile (919) 600-5035
scott@whitfieldbryson.com

# EXHIBIT A



# TEXAS DEPARTMENT OF AGRICULTURE
## COMMISSIONER SID MILLER

January 25, 2018

AQ Textiles LLC
214 Staunton Drive
Greensboro, North Carolina 27410

Creative Textile Mills PVT. LTD
212 Cama Industrial Estate
Sun Mill Compound Mumbai
Maharashtra 400013 India

Macy's Inc.
7 West 7th Street
Cincinnati, Ohio 45202

Re:  Fairfield Square Collection
     Thread count involving Luxury Sateen Essex Stay Fit Queen Sheet Set with pillow cases
     (the "Goods")—Alleged 1200 thread count.

Enclosed is a copy of Mr. Kleinschmidt's January 24, 2018 correspondence to you, *including all attachments*.

Sincerely,

Stephen P. Dillon
Lead Deputy General Counsel

cc:

Office of the Attorney General
Consumer Protection Division
PO Box 12548
Austin, TX 78711-2548

Consumer Complaints
Federal Trade Commission
600 Pennsylvania Avenue, NQ
Washington, DC 20580

Case 1:19-cv-00983-LCB-JLW   Document 36-1   Filed 03/29/21   Page 64 of 99



# TEXAS DEPARTMENT OF AGRICULTURE
## COMMISSIONER SID MILLER

January 24, 2018

AQ Textiles LLC
214 Staunton Drive
Greensboro, North Carolina 27410

Creative Textile Mills PVT. LTD
212 Cama Industrial Estate
Sun Mill Compound Mumbai
Maharashtra 400013 India

Macy's Inc.
7 West 7th Street
Cincinnati, Ohio 45202

Re:    Fairfield Square Collection
       Thread count involving Luxury Sateen Essex Stay Fit Queen Sheet Set with pillow cases
       (the "Goods")—Alleged 1200 thread count.

Attention Distributor and Manufacturer:

The Texas Department of Agriculture (TDA) has received a complaint concerning thread count
of the Goods described in Attachment A to this letter.

The Goods listed in Attachment A were distributed in Texas with the representations listed in
Attachment A to this letter.

TDA has obtained the quantity test results as shown in Attachment B to this letter.

Based on its review of the information described above, TDA has determined the distributor and
manufacturer may have engaged in deceptive acts and practices within the State of Texas which
are prohibited under Section 17.46 of the Texas Business and Commerce Code, as follows:

A. Advertising the Goods as having a thread count of 1200, when in fact, according to the
   test results shown in Attachment B, the Goods have a thread count of 441, which
   constitutes a materially false, misleading or deceptive act or practice.
B. Representing the Goods have characteristics which they do not have.
C. Representing that Goods are of a particular standard, when they are of another.
D. Failing to disclose information concerning Goods which was known at the time of the
   consumer's purchase when such failure to disclose information was intended to induce
   the consumer into a transaction into which the consumer would not have entered had
   the information that the thread count was incorrect been disclosed.

By copy of this letter, the Texas Department of Agriculture is requesting that the Office of the
Attorney General, State of Texas, Consumer Protection Division, and the Federal Trade
Commission, investigate the matters stated herein, and in the event said agencies determine
that the deceptive trade practices stated above have occurred, to prosecute said actions to the
fullest extent of federal and state law.

P.O. Box 12847
Austin, Texas 78711

TEXASAGRICULTURE.GOV

(512) 463-7476
Fax: (888) 223-8861

Case 1:19-cv-00983-LCB-JLW   Document 36-1   Filed 03/29/21   Page 65 of 99

TDA urges you, in order to mitigate possible damage occurring to consumers purchasing the Goods mentioned herein, to stop sales of said Goods, or to correctly repackage said Goods to reflect the proper characteristics of said Goods. In the event you are not a manufacturer or distributor of the above mentioned Goods please contact Mr. Stuart Strnad at 512-463-5706, or via email at Stuart.Strnad@TexasAgriculture.gov, and provide the name and address of the manufacturer/distributor, if such is known to you, to help TDA protect Texas consumers.

Sincerely,

Tim Kleinschmidt, General Counsel
Texas Department of Agriculture
(512) 463-6260
P. O. Box 12847
1700 North Congress, Austin Tx 78711
Tim.Kleinschmidt@TexasAgriculture.gov

cc:

Office of the Attorney General
Consumer Protection Division
PO Box 12548
Austin, TX 78711-2548

Consumer Complaints
Federal Trade Commission
600 Pennsylvania Avenue, NQ
Washington, DC 20580

## **Weights and Measure Photo Documentation**

**INCIDENT NUMBER:** *NA*

**Inspector Name:** *Stuart W Strnad*
**Region:** Austin
**Inspection Date:** **12/03/17**

**Responsible Party:** Macy's Inc.
**Physical Address: 7** West Seventh Street, Cincinnati, Ohio 45202
**Website:** http://www.macysinc.com

**Facility Name:** Macy's North Park Center
**Physical Address:** 8687 North Central Expressway Dallas, TX 75225

**Re:** Thread count involving Luxury Sateen Essex Stay Fit Queen Sheet Set with
pillow cases (the "Goods")—Alleged 1200 thread count. Additional non-
compliance of the NIST HB 130 Uniform Packaging and Labeling Regulation,
Section **5. Declaration of Responsibility for Consumer packages**



**Photo #:** 1 (0037.jpg)

**Comment:** Fairfield Square sheet sets, Essex Stay Fit 1200 Thread Count, main display
panel.

Case 1:19-cv-00983-LCB-JLW   Document 36-1   Filed 03/29/21   Page 67 of 99



**Photo #:** 2 (0038.jpg)

**Comment:** Fairfield Square sheet sets, Essex Stay Fit 1200 Thread Count, side panel.



**Photo #:** 3 (0041.jpg)

**Comment:** Fairfield Square sheet sets, Essex Stay Fit 1200 Thread Count, rear display panel.

Case 1:19-cv-00983-LCB-JLW   Document 36-1   Filed 03/29/21   Page 69 of 99



Attachment "B"

**Quality Assurance & Compliance Testing**
**Utilizing Textile & Related Technologies**
19 West 36th Street, 10th Floor
New York, NY 10018
Tel: 212 947 8391   Fax: 212 947 8719

www.vartest.com

# ISO/IEC 17025 Certified Third Party Test Report

**DATE:**     November 28, 2017          **FILE:** TEXASD.A112017A

**CLIENT:**   Texas Dept. of Agriculture     **ATTN:** Stuart Strnad
              1700 N Congress Ave, Ste 1125E
              Austin, TX 78701

## SAMPLE IDENTIFIED BY CLIENT AS:

Pillowcase Submitted
Name: Fairfield Square
Style: Essex Stay Fit
Lot #: 20102104082AQT
Ref: 1200 Thread Count, 6PC King Sheet Set
Color Grey

**TEST PROCEDURE:**          **TEST RESULTS:**

**THREAD COUNT**
**(ASTM D3775):**            363

**COMMENT:**                 Assumes 3 picks weaving as 1.
                             Ends are spun. Picks are filament.
                             Filling yarn is partially separable.

Signed For The Company By

Adam R. Varley
Technical Director

JG/11

Stacy Sadowy
Quality Assurance Manager

The findings and results in this test report apply only to the specific sample(s) submitted to us by the
client for testing.





**Quality Assurance & Compliance Testing**
**Utilizing Textile & Related Technologies**
19 West 36th Street, 10th Floor
New York, NY 10018
Tel: 212 947 8391   Fax: 212 947 8719

www.vartest.com

# ISO/IEC 17025 Certified Third Party Test Report

**DATE:** December 12, 2017

**FILE:** TEXASD.A120617A
**PO #:** 551-8-13183

**CLIENT:** Texas Dept. of Agriculture
1700 N Congress Ave, Ste 1125E
Austin, TX 78701

**ATTN:** Stuart Strnad

### SAMPLE IDENTIFIED BY CLIENT AS:

Sheet Set Submitted
Name: Fairfield Square
Style: Luxury Sateen Essex Stay Fit (Queen 6 PC Sheet Set)
Lot #: 20102103002AQT
Ref: 1200 Thread Count, 6 PC, 1 Flat Sheet, 1 Fitted Sheet &
4 Standard Pillow Cases
Color Green

**TEST PROCEDURE:**                    **TEST RESULTS:**

**THREAD COUNT**
**(ASTM D3775):**                       441

**COMMENT:**                            Assumes 4 picks weaving as 1.
Ends are spun. Picks are filament.
Filling yarn is partially separable.

Signed For The Company By

Adam R. Varley
Technical Director

JG/12

Stacy Sadowy
Quality Assurance Manager

The findings and results in this test report apply only to the specific sample(s) submitted to us by the client for testing.

ilac-MRA
**ACCREDITED**
Testing Cert #2180.01



# TEXAS DEPARTMENT OF AGRICULTURE
## COMMISSIONER SID MILLER

February 16, 2018


Ms. Ann McCauley
Executive Vice President, Secretary and General Counsel
The TJX Companies, Inc.
770 Cochituate Road
Framingham, Massachusetts 01701

Mr. Talat Mahmood, Director
AQ Textiles LLC
214 Staunton Drive
Greensboro, North Carolina 27410

AQ Textiles LLC
7622 Royster Road
Greensboro, North Carolina 27455

Creative Textile Mills PVT. LTD
212 Cama Industrial Estate
Sun Mill Compound Mumbai
Maharashtra 400013 India

Re:     Thread count

        Ultra Lux 800 TC Wrinkle Resistant Luxury Sateen Weave Six Piece Queen Sheet Set
        (the "Goods")—Alleged 800 Thread Count

Attention Distributor(s), Manufacturer(s) and Retailer(s) of the Goods:

The Texas Department of Agriculture (TDA) has received a complaint concerning thread count
of the Goods listed in Attachment A to this letter.

The Goods listed in Attachment A were distributed with the representations listed in
Attachment A to this letter.

TDA has obtained the quantity test results as shown in Attachment B to this letter.
Based on its review of the information described above, TDA has determined the
manufacturer(s), distributor(s) and retailer(s) stated above may have, pursuant to Texas
Business and Commerce Code, Section 17.46, Deceptive Trade Practices Unlawful, engaged in
deceptive trade acts as follows:

P.O. Box 12847
Austin, Texas 78711

TexasAgriculture.gov

(512) 463-7476
Fax: (888) 223-8861

The TJC Companies, Inc.
AC Textiles LLC
Creative Textile Mills Pvt. Ltd.
Ultra Lux 800 TC – Thread Count
February 16, 2018
Page 2 of 3

1. Advertising the Goods as having a thread count of 800, when in fact, according to the test results shown in Attachment B, the Goods have a thread count of 293, which constitutes a materially false, misleading or deceptive practice.

2. Representing the Goods have characteristics which they do not have.

3. Representing that Goods are of a particular standard, when they are of another.

4. Failing to disclose information concerning Goods which was known at the time of the consumer's purchase when such failure to disclose information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information that the thread count was incorrect been disclosed.

By copy of this letter, the Texas Department of Agriculture is requesting that the Office of the Attorney General, State of Texas, Consumer Protection Division, and the Federal Trade Commission, investigate the matters stated herein, and in the event said agencies determine that the deceptive trade practices stated above have occurred, to prosecute said actions to the fullest extent of federal and state law.

TDA urges you, in order to mitigate possible damage occurring to consumers purchasing the Goods mentioned herein, to stop sales of said Goods, or to correctly repackage said Goods to reflect the proper characteristics of said Goods.

In the event you are not a manufacturer, distributor or retailer of the above mentioned Goods, please contact Mr. Stuart Strnad, Director for Consumer Product Protection, Agriculture and Consumer Protection Division, Texas Department of Agriculture, at 512-463-7476, or by writing him at P.O. Box 12847, Austin, Texas 78711, and provide the name and address of the manufacturer/distributor, if such is known to you, to help TDA protect consumers.

Sincerely,

Tim Kleinschmidt, General Counsel
Texas Department of Agriculture
(512) 463-6260
Tim.Kleinschmidt@TexasAgriculture.gov

The TJC Companies, Inc.
AC Textiles LLC
Creative Textile Mills Pvt. Ltd.
Ultra Lux 800 TC – Thread Count
February 16, 2018
Page 3 of 3

cc:     Office of the Attorney General
        Consumer Protection Division
        PO Box 12548
        Austin, TX 78711-2548

        Consumer Complaints
        Federal Trade Commission
        600 Pennsylvania Avenue, NW
        Washington, DC 20580

**IMG 0206 Ultra Lux 800 Thread Count Sold at TJMaxx**





**Quality Assurance & Compliance Testing**
**Utilizing Textile & Related Technologies**
19 West 36th Street, 10th Floor
New York, NY 10018
Tel: 212 947 8391   Fax: 212 947 8719

www.vartest.com

## 𝕴𝕾𝕺/𝕴𝕰𝕮 17025 Certified Third Party Test Report

**DATE:**   November 28, 2017          **FILE:** TEXASD.A112017B

**CLIENT:**   Texas Dept. of Agriculture      **ATTN:** Stuart Strnad
1700 N Congress Ave, Ste 1125E
Austin, TX 78701

### SAMPLE IDENTIFIED BY CLIENT AS:

Pillowcase Submitted
Name: Ultra Lux
Style: Wrinkle Resistant Luxury Sateen Weave
Lot #: 20372103377AQT
Ref: 800 Thread Count, 6PC Queen Sheet Set
Color Dark Taupe

**TEST PROCEDURES:**               **TEST RESULTS:**

**THREAD COUNT**
**(ASTM D3775):**                        293

**COMMENT:**                             Assumes 2 picks weaving as 1.
Ends are spun. Picks are filament.
Filling yarn is partially separable.

Signed For The Company By

Adam R. Varley
Technical Director

JG/11

Stacy Sadowy
Quality Assurance Manager



The findings and results in this test report apply only to the specific sample(s) submitted to us by the client for testing.

# EXHIBIT B



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Division of Enforcement
Bureau of Consumer Protection

August 2, 2005

Mr. E. Linwood Wright, III
Chairman
Textile Bedding Committee
National Textile Association
6 Beacon Street, Suite 1125
Boston, MA 02108

Dear Mr. Wright:

Thank you for your letter requesting a Commission staff opinion regarding the appropriate way to disclose fabric "thread count" (yarns per square inch) on labels or in advertising for household textile products, such as bed sheets. Please note that this information is not required pursuant to the Textile Fiber Products Identification Act, 15 U.S.C. § 70 *et seq.*, and Commission rules and regulations under the Act, 16 C.F.R. Part 303. It is, however, governed by Section 5 of the FTC Act, which prohibits deceptive acts or practices. 15 U.S.C. § 45.

You state that the thread count is an important indicator of fabric quality for consumers who purchase textile bedding products, and that thread count has evolved over time as a key indicator used by consumers to make purchasing decisions. In addition, you state that it is generally understood that a higher thread count indicates a better product. Your letter describes the specific issue with regard to description of thread count as follows:

> The common practice in the U.S. textile bedding industry for decades has been to count the number of threads in both the warp and filling directions. Yarns were counted as one yarn, regardless of whether the yarn was a single ply or multi-ply yarn. (A multi-ply yarn is one yarn that has been created by twisting two or more yarns together.) In recent years, however, some textile bedding suppliers have changed the way they have determined thread count by counting plied yarns individually. This practice inflates the thread count numbers to levels which double or triple (or more) the thread count as determined by the long standing, traditional way. This practice has also created confusion in the marketplace and has caused consumers to compare thread counts that may have been calculated in two dramatically different ways.

Finally, you state that some of your member companies have experienced competitive disadvantage by using the traditional method of counting threads and are considering switching to the method of multiplying by the number of plies within a yarn, thus achieving a higher thread count. You ask for the staff's opinion as to whether the new method could violate Section 5 of the FTC Act.

Mr. E. Linwood Wright, III, page 2

You further note that ASTM, an international standards organization, has addressed this issue in its Standard Test Method for Warp End Count and Filling Pick Count of Woven Fabric, Designation: D3775-03a. Section 9.1.4 instructs: "Count individual warp yarns (ends) and filling yarns (picks) as single units regardless of whether they are comprised of single or plied components."

A representation about thread count, like other objective, material claims about a product, must be supported by a "reasonable basis." In determining what constitutes a reasonable basis for claims, we consider what experts in the field believe is appropriate, including whether there are relevant consensus based test procedures, such as an ASTM test procedure, or other widely accepted industry practices that apply to the matter. If so, we give such procedures or practices great weight in determining whether the advertiser has met its substantiation burden.

Based upon the ASTM standard, as well as the information you have provided about standard industry practices with regard to disclosing thread count, we believe that consumers could be deceived or misled by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn. A possible non-deceptive way to disclose both the thread count and the yarn ply would be to state, for example: "300 thread count, 2 ply yarn." A representation of "600 thread count" for this same product would likely mislead consumers about the quality of the product being purchased.

I also wish to bring to your attention a 1996 closing letter, placed on the FTC public record, terminating an investigation of possibly deceptive practices in connection with the packaging of down comforters. In that instance, the staff determined that no further Commission action was warranted when the company notified the staff that it was changing its package product description from "finely woven 760 threads per sq. inch" to "finely woven 380 2-ply fabric." A copy of this closing letter is attached.

In accordance with Section 1.3(c) of the Commission's Rules of Practice and Procedure, 16 C.F.R. § 1.3(c), this is a staff opinion only and has not been reviewed or approved by the Commission or by any individual Commissioner, and is given without prejudice to the right of the Commission later to rescind the advice and, where appropriate, to commence an enforcement action. In accordance with Section 1.4 of the Commission's Rules of Practice and Procedure, 16 C.F.R. § 1.4, your request for advice, along with this response, will be placed on the public record.

We appreciate your taking the time to write to us. Please feel free to call Steve Ecklund at 202-326-2841 if you have any further questions.

Sincerely yours,

James Kohm
Associate Director for Enforcement

Enclosure

# EXHIBIT C





FEDERAL TRADE COMMISSION

JAN 3 1 2002

DIVISION ENFORCEMENT

**A MERICAN T EXTILE
M ANUFACTURERS I NSTITUTE**

January 31, 2002

Mr. Steve Ecklund
Federal Trade Commission
Division of Enforcement
Washington, DC 20580

Re:     Request for FTC Staff
        Opinion on Yarn Count

Dear Mr. Ecklund:

It has come to our attention again that some companies are marketing bed
sheets and pillowcases to U.S. consumers where extremely high yarn or thread
counts are claimed – some as high as 1000 count. We believe these products
are mislabeled, creating deceptive information for the consumer.

Labeling these products based on a count that includes each ply in plied yarns
deceives the customer into believing that bedding products with higher counts
are better when, in fact, they might be inferior because of the method used to
determine the count. We wrote to the Commission regarding this same issue on
February 24, 1997 (copy enclosed) and provided a fabric sample and
independent lab report verifying our position.

In many cases, these extremely high counts are achieved by counting yarns
within a ply as individual yarns, thus dramatically increasing the number of yarns
in a square inch of fabric. A plied yarn is one in which two or more yarns are
twisted together to form a single strand.

ATMI believes this method of labeling products based on counting each
individual yarn in plies to be a deceptive practice, which misleads the American



1130 Connecticut Ave., NW • Suite 1200 • Washington, DC 20036-3954
202-862-0500 • fax: 202-862-0570 • http://www.atmi.org
fax on demand: 202-862-0572

public into making decisions to purchase items, based on false and misleading information.

ASTM method D 3775-96 (Standard Test Method for Fabric Count of Woven Fabric) is the long-accepted industry standard for determining count. This method has been in use in this country for many years and serves as the industry's standard way to report the count of many woven textile fabrics, including sheeting. It is based on the number of yarns in the warp direction and filling direction, regardless of ply, and has become an important parameter used by consumers to judge the quality of sheeting products, since the higher the count, the more luxurious the product.

ATMI believes that any information provided to the consumer should be true and correct so as not to be deceptive or mis-leading. We believe that plied yarns are properly counted as only one yarn. For example, a fabric containing 250 individual four ply yarns in a square inch would be described as a "250 thread count fabric, even though each thread or yarn contained four plies twisted together." It would be false and mis-leading to describe this as a 1000 thread count product.

ATMI requests a staff opinion from the Federal Trade Commission on this issue. We believe that manufacturers, importers and retailers of bed sheets should rely on the ASTM D3775-96 standard test method to determine count.

Sincerely,

*Carlos Moore*

Carlos Moore
Executive Vice President

Enclosure

# EXHIBIT D



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
600 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20580

Division of Enforcement
Bureau of Consumer Protection

March 18, 2002

Mr. Carlos Moore
Executive Vice President
American Textile Manufacturers Institute
1130 Connecticut Ave., NW, Suite 1200
Washington, DC 20036-3954

Re: <u>Request for FTC Staff Opinion concerning Thread Count</u>

Dear Mr. Moore:

This is in reply to your letter requesting a Commission staff opinion regarding the appropriate method for determining fabric "thread count," or yarns per square inch, in textile products such as bed sheets and pillow cases. You state that some companies are marketing bedding products with extremely high yarn or thread counts, achieved by counting yarns within a ply as individual yarns, thus dramatically and deceptively increasing the number of yarns in a square inch of fabric. You make specific reference to the American Society for Testing and Materials (ASTM) test method D 3775, titled "Standard Test Method for Fabric Count of Woven Fabric," and you express the view that this method is the long-accepted industry standard for determining thread count.

Under the Commission's Rules of Practice, 16 C.F.R. § 1.1(a), the Commission (and, under delegated authority, its staff) may render an advisory opinion with respect to a prospective course of conduct proposed by the requesting party:

§ 1.1 Policy.

(a) Any person, partnership, or corporation may request advice from the Commission with respect to a course of action which the requesting party proposes to pursue.

In this instance, ATMI is not seeking advice with respect to a course of conduct it proposes to pursue. Rather, ATMI is seeking an opinion as to whether certain representations made by some industry members with regard to thread count might be considered deceptive under the FTC Act. As such, the question is not appropriate for issuance of a staff advisory opinion.

Mr. Carlos Moore
page 2

Although we are unable to provide you with a staff advisory opinion about whether counting yarns within a ply as individual yarns would be deceptive, we can advise you as to how the Commission staff generally would analyze such claims. A thread count claim, like other objective, material claims about a product, must be supported by a "reasonable basis." In determining what constitutes a reasonable basis for claims, we would consider what experts in the field believe is appropriate, including whether there are relevant consensus based test procedures, such as an ASTM test procedure, or other widely accepted industry practices that apply to the matter. If so, we would give such procedures or practices great weight in determining whether the advertiser has met its substantiation burden. In other related contexts, the Commission has encouraged the use of ASTM tests. *See* Press Release, FTC Announces Actions on Wool Labeling Rules, dated March 8, 1994 (copy attached) ("In its clarification of the procedure used for testing the fiber content of wool products, the FTC said the industry members should, where possible, use procedures established by the American Society for Testing and Materials (ASTM).")

I also wish to bring to your attention a closing letter that is on the public record concerning an investigation of possibly deceptive practices in connection with the packaging of down comforters. In that instance, the staff determined that no further Commission action was warranted when the company notified the staff that it was changing its package product description from "760 White Goose Down" to "finely woven 380 2-ply fabric." (copy attached).

Pursuant to Section 1.4 of the Commission's Rules of Practice and Procedure, 16 C.F.R. § 1.4, your letter, together with this response, will be placed on the public record.

I hope you will find the above information helpful.

Sincerely yours,

Elaine D. Kolish
Associate Director for Enforcement

Enclosures

# EXHIBIT E



# EXHIBIT F



**OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION
CIVIL INVESTIGATIVE DEMAND**

TO:  **Mr. Talat Mahmood, Director**
     **AQ Textiles LLC**            **Via CMRRR: 7014 1200 0000 2190 5817**
     **214 Staunton Drive**
     **Greensboro, North Carolina 27410**

C/O
     **Mr. James L. Lester**
     **Attorney at Law**
     **MacCord Mason**
     **300 North Greene Street, Suite 1600**
     **Greensboro, North Carolina 27401**

Pursuant to this office's specific authority under section 17.61 of the Texas Deceptive Trade Practices – Consumer Protection Act, sections 17.41-.63, Texas Business and Commerce Code ("DTPA"), You are hereby directed to produce the items listed in **Exhibit A** attached hereto. Such production is governed by the instructions and definitions on this page and subsequent pages.

You are to make available the documentary material described in **Exhibit A** to the undersigned Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division ("Division"). This documentary material may be sent electronically or by courier or certified mail to the Office of Attorney General, 300 W. 15th Ste., 9th Floor, Austin, Texas 78701, and is due on September 16, 2019.

The Division believes that You are in possession, custody, or control of documentary material relevant to the subject matter of an investigation of possible violations of sections 17.46(a) and (b) of the DTPA.

---

**TAKE NOTICE THAT pursuant to § 17.62, TEX. BUS. & COM. CODE, any person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other means falsifying any documentary material may be guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not more than one year, or both.**

---

ISSUED THIS 30th day of August, 2019.

**Ray Olah**
**Assistant Attorney General**           *AUTHORIZED AGENT:*
**CONSUMER PROTECTION**                   **Javier Juarez**
**(512) 936-1705 (TELEPHONE)**            **(512) 475-4637**
ray.olah@oag.texas.gov

Page **1** of **7**

# EXHIBIT A: DOCUMENTS TO BE PRODUCED

1.      Requests (a)-(k) below refer to the products labeled as follows: (1) Luxury Sateen Essex Stay Fit Queen Sheet Set with pillow cases ("Essex Product"), as pictured and represented in **Exhibit C**, and (2) Ultra Lux 800 TC Wrinkle Resistant Luxury Sateen Weave Six Piece Queen Sheet Set ("Ultra Lux Product"), as pictured and represented in **Exhibit D**. Please produce:

    a.      Documents that identify the manufacturer(s), supplier(s), and distributor(s) of the Essex Product;

    b.      Documents that identify the manufacturer(s), supplier(s), and distributor(s) of the Ultra Lux Product;

    c.      A representative example of each label affixed to the Essex Product;

    d.      A representative example of each label affixed to the Ultra Lux Product;

    e.      A representative example of the product packaging in which the Essex Product is sold at retail;

    f.      A representative example of the product packaging in which the Ultra Lux Product is sold at retail;

    g.      Documents which reflect all specifications for the Essex Product provided by you to the manufacturer, supplier or distributor;

    h.      Documents which reflect all specifications for the Ultra Lux Product provided by you to the manufacturer, supplier or distributor;

    i.      Documents which reflect all specifications provided to you by the manufacturer, supplier or distributor of the Essex Product;

    j.      Documents which reflect all specifications provided to you by the manufacturer, supplier or distributor of the Ultra Lux Product;

    k.      Any agreements between you and any manufacturer, supplier, or distributor identified in your responses to the requests regarding the Essex Product;

    l.      Any agreements between you and any manufacturer, supplier, or distributor identified in your responses to the requests regarding the Ultra Lux Product;

    m.      Documents which reflect communications between you and the manufacturer, supplier or distributor of the Essex Product;

    n.      Documents which reflect communications between you and the manufacturer, supplier or distributor of the Ultra Lux Product;

    o.      Documents which set forth or reflect purchase orders for the Essex Product;

p.      Documents which set forth or reflect purchase orders for the Ultra Lux Product;

q.      Documents which reflect communications regarding the Essex Product between you and any purchaser of the Essex Product;

r.      Documents which reflect communications regarding the Essex Product between you and any purchaser of the Ultra Lux Product;

s.      Advertisements and any other promotional material regarding the Essex Product;

t.      Advertisements and any other promotional material regarding the Ultra Lux Product;

u.      Test reports and any documents reflecting any testing performed on the Essex product; and

v.      Test reports and any documents reflecting any testing performed on the Ultra Lux product.

2.      Documents sufficient to identify the person or persons responding to this Civil Investigative Demand, as well as their addresses, phone numbers, inclusive dates of employment with you, job titles, and job responsibilities. In lieu of providing actual documents, you may provide a list containing the requested information.

3.      Documents sufficient to identify each person who assisted in your response, and for each such person, the number(s) of the request(s) which that person(s) assisted in your response. In lieu of providing actual documents, you may provide a list containing the requested information.

Page 3 of 7

# EXHIBIT B: INSTRUCTIONS AND DEFINITIONS

1.  Consult Before Producing Documents. Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, you must consult with the Authorized Agent of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

    Likewise, before producing any original documents, you are required to consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

2.  Production of Electronic Documents. Unless otherwise agreed to in writing by the Authorized Agent, electronically stored information shall be produced in electronic form. Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the Authorized Agent of the OAG identified above and reach agreement regarding the format and method of production.

3.  Duty to Preserve Documents. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise. Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

4.  **Relevant Dates. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents from 2015 to the present.**

5.  Custody and Control. In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

6.  Privileged Documents. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

    a.  the document's control numbers;

    b.  all authors of the document;

    c.  all addressees of the document;

    d.  all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

    e.  the date of the document;

f.      a description of the subject matter of the document sufficient to determine the applicability of the privilege;

g.      the nature or type of the privilege that is being asserted for the document (e.g., "attorney- client privilege");

h.      the specification(s) of the Demand to which the document is responsive;

i.      the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7.      Trade Secrets. It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(t) of the Texas Business and Commerce Code.

8.      You May Produce Copies. Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of AQ Textiles LLC, stating that the copies are true, correct, and complete copies of the original documents and were generated and maintained in the ordinary course of Your business, and provided that where the original contains colored text or images, a color copy must be provided.

9.      Non-identical Copies to be Produced. Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

10.     No Redaction. All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

11.     Documents to be Bates Numbered. Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

12.     Document Organization. Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.

Page **5** of 7

**Questions.** Questions concerning this Civil Investigative Demand should be directed to Investigator Javier Juarez at (512) 475-4637 or Assistant Attorney General Ray Olah at (512) 936-1705.

## Definitions

1.  "You," "your," "the business," or "your company" means AQ Textiles LLC, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2.  "Document" means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems.

3.  The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices.

4.  "Entity" means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

5.  "Identify" means

    a.  Regarding a natural person, documents that state that individual's:

        i.    name;
        ii.   current or last known telephone numbers at business and home; and
        iii.  current or last known business and home addresses;
        iv.   current or last known email address.

    b.  Regarding a non-natural person or entity, documents that state:

        i.    its full name;
        ii.   the nature of its organization;

      iii.      the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated;

      iv.      its principal line of business or activity; and

      v.      the name of its chief executive officer and/or president and his or her mailing address, email address and telephone number.

6.      "Including" means including, but not limited to.

7.      The words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

**EXHIBIT C**

## <u>Weights and Measure Photo Documentation</u>

**INCIDENT NUMBER:** *NA*

**Inspector Name:** *Stuart W Strnad*
**Region:** Austin
**Inspection Date:** **12/03/17**

**Responsible Party:** Macy's Inc.
**Physical Address:** 7 West Seventh Street, Cincinnati, Ohio 45202
**Website:** http://www.macysinc.com

**Facility Name:** Macy's North Park Center
**Physical Address:** 8687 North Central Expressway Dallas, TX 75225

**Re:** <u>Thread count involving Luxury Sateen Essex Stay Fit Queen Sheet Set with pillow cases (the "Goods")—Alleged 1200 thread count. Additional non-compliance of the NIST HB 130 Uniform Packaging and Labeling Regulation, Section **5. Declaration of Responsibility for Consumer packages**</u>



**Photo #:** 1 (0037.jpg)

**Comment:** Fairfield Square sheet sets, Essex Stay Fit 1200 Thread Count, main display panel.

ACP 1.0
Page 1



**Photo #:** 2 (0038.jpg)

**Comment:** Fairfield Square sheet sets, Essex Stay Fit 1200 Thread Count, side panel.

ACP 1.0
Page 2



**Photo #:** 3 (0041.jpg)

**Comment:** Fairfield Square sheet sets, Essex Stay Fit 1200 Thread Count, rear display panel.

ACP 1.0
Page 3

**IMG_0206 Ultra Lux 800 Thread Count Sold at TJMaxx**

